222 So.2d 470 (1969)
TIMES PUBLISHING COMPANY, Etc., et al., Appellants,
v.
William WILLIAMS et al., Appellees.
No. 68-369.
District Court of Appeal of Florida. Second District.
May 9, 1969.
*471 Baynard, McLeod & Nelson, St. Petersburg, for appellants.
McClure & Turville, St. Petersburg, for appellees.
*472 Earl Faircloth, Atty. Gen., T.T. Turnbull and Arthur C. Canaday, Asst. Attys. Gen., Tallahassee, amici curiae.
LILES, Chief Judge.
The 1967 session of the Florida Legislature enacted Chapter 67-356, Laws of Florida, 1967,[1] which became effective July 1, 1967, and appears in Florida Statutes as § 286.011, F.S.A. It has appropriately been labeled Florida's "Government in the Sunshine Law."
Appellants, Times Publishing Company, Charles Patrick and Betty Orsini, filed a complaint in the Circuit Court of Pinellas County alleging that the Pinellas County School Board had held various secret meetings during 1967 and 1968 subsequent to the enactment of the above statute. They complained that these meetings were in violation of this statute and asked for an injunction enjoining the Board from holding future meetings from which the public was to be excluded. At the conclusion of appellants' testimony, the trial judge dismissed the complaint with prejudice and refused to grant appellants an injunction. This appeal followed.
It is urged by appellants that under the aforesaid Chapter 67-356, injunctive relief is available to the members of the public to enjoin and prohibit the Board of Public Instruction of Pinellas County, Florida, from holding meetings at which official acts are to be taken if the public is to be excluded. They also urge that whenever the Board meets "informally" for any purpose relating to the operation of schools of Pinellas County and excludes the public it is violating the statute and should be enjoined from holding such a secret meeting.
The Attorney General of the State of Florida asked for and was granted permission to file a brief and argue amicus curiae in this matter.
Prior to the enactment of Chapter 67-356, Florida already had an open meeting statute, § 165.22, F.S.A., relating to the meetings of city councils. This section provides that as to city or town governing bodies, "All meetings * * * shall be held open to the public." There is no language in that act referring to "official acts" or "formal action," as there is in the act before us; nor is there any provision relating to injunctive relief as here.
In the only case construing § 165.22, F.S.A., our Supreme Court in Turk v. Richard, Fla. 1950, 47 So.2d 543, merely limited the application of the "All meetings" provision thereof to "such formal assemblages of the [city] council sitting as a joint deliberative body as were required or authorized by law to be held for the transaction of official municipal business * * *." It was therein noted that such a "formal assemblage" existed when the *473 governing body was sitting "as a board of entity * * *, for the purpose of joint discussion, decision and action with respect to municipal affairs * * *." (Italics supplied.) "For at no other type of gathering," it was said, "whether attended by all or only some of the members of the city council, could any formal action be taken or agreement be made that could officially bind the municipal corporation * * *." (Italics supplied.) That case really only stands for the proposition therefore, that a "meeting," within the purview of the act, is a joint assemblage at which "formal action" could be taken, though not necessarily certain to be taken. Furthermore, the Turk case does not limit application of the "All meetings" provision only to those "formal" assemblages at which the ritual of voting to confirm or ratify an official decision is ceremoniously carried out, or to those occasions on which some formal execution is performed to make a document binding or legally affective.
The legislature is presumed to have been aware of the ruling case law as it relates to the subject matter of a statute, and to have drawn it with those cases in mind. It is obvious that the legislature intended to extend application of the "open meeting" concept so as to bind every "board or commission" of the state, or of any county or political subdivision over which it has dominion and control. In so doing, it expressly provided that the act related to "All meetings [of the governing bodies involved] * * * at which official acts are to be taken * * *" (italics supplied), and as one of the remedies for a violation thereof it effectively voided any "formal action" taken by such bodies at closed meetings. There is nothing in the language of the act from which it can be said that the legislature intended to avoid or limit the holding in Turk. As far as it goes, the Turk case is helpful as it relates to the nature of the meetings covered by such an act, and insofar as it defines "meetings."
But the question still remains as to just what is meant by the terms "official acts" and "formal action" which were added in Chapter 67-356; and the Turk case cannot help us there because these phrases were not in the act before that court. However, in Walling v. Carlton, 1933, 109 Fla. 97, 147 So. 236, the court defined an "official act" as, "any act done by the officer in his official capacity under color and by virtue of his office." This case is also helpful, but the court there was concerned with an affirmative act of the officer involved, and does not fully answer the question before us, because it does not talk about passive acts or about non-formal acts such as: the act of discussion; the act of deliberating; the act of deciding; or the act of listening to reports or expert advice about which an official might thereafter be charged with actual knowledge. These passive and non-formal acts are certainly "official" if they relate to the affairs and duties of that body; yet they couldn't be said to constitute "formal action" of the body.
Every thought, as well as every affirmative act, of a public official as it relates to and is within the scope of his official duties, is a matter of public concern; and it is the entire decision-making process that the legislature intended to affect by the enactment of the statute before us. This act is a declaration of public policy, the frustration of which constitutes irreparable injury to the public interest. Every step in the decision-making process, including the decision itself, is a necessary preliminary to formal action. It follows that each such step constitutes an "official act," an indispensable requisite to "formal action," within the meaning of the act.
We think then that the legislature was obviously talking about two different things by the use of these phrases, and we can't agree with appellee that "official acts" are limited to "formal action," or that they are synonymous. Clearly the legislature must have intended to include more than the mere affirmative formal act of voting on an issue or the formal execution of an *474 official document. These latter acts are indeed "formal," but they are matters of record and easily ascertainable (though perhaps ex post facto), notwithstanding such legislation; and indeed the public has always been aware sooner or later of how its officials voted on a matter, or of when and how a document was executed. Thus, there would be no real need for the act if this was all the framers were talking about. It is also how and why the officials decided to so act which interests the public. Thus, in the light of the language in Turk, supra, and of the obvious purpose of the statute, the legislature could only have meant to include therein the acts of deliberation, discussion and deciding occurring prior and leading up to the affirmative "formal action" which renders official the final decisions of the governing bodies.
It is our conclusion, therefore, that with one narrow exception which we will discuss later, the legislature intended the provisions of Chapter 67-356 to be applicable to every assemblage of a board or commission governed by the act at which any discussion, deliberation, decision, or formal action is to be had, made or taken relating to, or within the scope of, the official duties or affairs of such body. This is the latest legislative expression on the subject; and if it intends to qualify this mandate insofar as it may impair the proper exercise of certain other specific duties of such governmental bodies,[2] it can expressly do so either as an amendment to the instant act or in supplementary legislation specifically relating to such other duties.
The next question to be decided is whether there may be any exception to the open meeting mandate of the act.
First of all, as has been noted, the act on its face provides for no exceptions; and unless there is a constitutional impediment to such a mandate it is conclusive. Nevertheless, appellee takes the position that it may meet privately behind closed doors, notwithstanding the act, to discuss matters relating to school personnel or to go into secret consultation with its attorney on all legal matters.
Concerning personnel matters, it contends that innocent school personnel may be ruined for life or their character assassinated if hearings relating to charges of misconduct are aired publicly and prove to be ill-founded. Be that as it may, the act is regulatory in nature and deals with the powers and discretion of certain governmental agencies. It is not in and of itself concerned with any rights or privileges of third parties dealing with such agencies. Any rights or privileges these third parties might have must be found elsewhere, and the governmental agencies involved cannot rely on such rights or privileges of third parties to extend their own powers and discretion regarding closed meetings contrary to the clear prohibition of the act.
Appellee submits also that the public interest is best served in many instances when matters relating to the hiring of school personnel can be discussed privately in an atmosphere conducive to uninhibited inquiry into such persons' background, qualifications, character, and so forth. Regardless of the wisdom of its position and regardless of good motive on its part, the power or discretion to decide questions of closed meetings for such purposes is no longer the appellee's to exercise. We are certain that the public-at-large is as interested in the good quality of school personnel as is appellee; and it must always be kept in mind that appellee, no less than any other governmental body, is an agency of the public-at-large, and possesses just so much delegated authority and privileges as the public (in this case through the constitutional vehicle of legislation) chooses to give it. The public has chosen to deny any privilege or discretion in appellee and similar governmental bodies to conduct closed meetings.
*475 Furthermore, "personnel matters" are not sacred nor legally privileged, nor do they enjoy any insulation from legislative control. Here we are aided by the history of the act's passage, and conclude that the legislature specifically intended to include "personnel matters" within the "open meetings" mandate of the act. After the Senate had passed Senate Bill 9, which became Chapter 67-356, the House of Representatives informed the Senate that they had passed the bill with several amendments. One amendment sought by the House read as follows: "This act shall not apply to hearings involving individuals charged with violation of laws or regulations respecting employment." I Journal of the House 959 (June 5, 1967). The Senate refused to concur in this amendment and returned the bill to the House where it subsequently passed it in its present form.
The relationship of the Board with its attorney stands on a different footing. The attorney-client relationship is a unique one under the law. Within this relationship both the attorney and the client enjoy rights and privileges independent of each other. The privilege the client enjoys is one of confidentiality. The privilege of confidentiality can be waived and the effect of Chapter 67-356 has been to waive the privilege on behalf of the board. The clear import of the "All meetings" provision of this statute is that the public, acting through the legislature, has waived the privilege with regard to the enumerated public bodies.
There is one aspect of the attorney-client relationship, however, in which there are obligations which bind the attorney; and the aspect involves his duties in the conduct of pending or impending litigation. His professional conduct in these matters is governed by the Canons of Ethics which are promulgated by the Supreme Court under the integrated Bar system in this state. Section 23 of Art. V of the Florida Constitution, F.S.A., gives "exclusive" jurisdiction to the Supreme Court in the disciplining of attorneys; and this disciplinary power necessarily includes the exclusive province to proscribe rules of professional conduct the breaching of which renders an attorney amenable to such discipline.
The legislature therefore, is without any authority to directly or indirectly interfere with or impair an attorney in the exercise of his ethical duties as an attorney and officer of the court. See Florida Bar v. Massfeller, Fla. 1965, 170 So.2d 834; State ex rel. Arnold v. Revels, Fla. 1959, 109 So.2d 1; Preamble, para. (b), Integration Rule of The Florida Bar, Florida Rules of Court, 1969, 32 F.S.A. This is not to say, of course, that it may not condemn unethical or criminal conduct, but the attorney has the right and duty to practice his profession in the manner required by the Canons unfettered by clearly conflicting legislation which renders the performance of his ethical duties impossible. He cannot be put in the untenable position of choice between a violation of a statute or a violation of a specific Canon insofar as they clearly conflict. We can perceive of the possibility of instances when there may be conflict between the two as they may relate to privacy and confidentiality in the handling of pending or anticipated litigation.
This is brought into focus, for example, if we consider the potential effect of extending the "open meetings" concept to a consultation between a governmental agency and its attorney involving settlement or adjustment of a matter in pending or contemplated litigation. Such settlement or adjustment, in the professional opinion of the attorney, may be fair and favorable to the public and, thus, under Canon No. 8, it would be his duty to so advise. It may further be the professional opinion of the attorney, in the best interests of the public (his real client), that such consultation be private and confidential so as not to jeopardize the settlement. Indeed, he may well feel that such advice would be useless if revealed in such a case, and his duty to so advise would be completely *476 compromised by a requirement that this advice be imparted in public. The client may have the right to accept or reject the judgment that settlement is called for, but it does not have the right to render impossible the attorney's duty to so advise; nor does the legislature have the authority to render this judgment sterile. The attorney's dilemma in the face of such legislation is obvious.
We emphasize that what we say here is limited only to that area of the attorney-client relationship in which the ethical obligations of the attorney clearly conflict with the dictates of this statute. The rights and privileges of confidentiality belonging to the client, however, have been waived by Chapter 67-356.
It is our conclusion, therefore, that the legislature is fully aware of its constitutional limitations and did not intend, by the enactment of Chapter 67-356, to place attorneys in a position of having no alternative but to violate the Canons of Ethics. We hold also, however, that since the public has waived any privilege of confidentiality it may have had by virtue of such relationship, the act does not permit private consultation between its agency and the attorney in any other circumstances except those narrowly outlined above.[3]
We now come to the specific injunctive relief prayed for here. Injunctive relief is an extraordinary remedy which issues only when justice requires and there is not adequate remedy at law, and when there is a real and imminent danger of irreparable injury. Statutory authority for such writs, as in the act before us, are not uncommon; but it must be remembered that such writs are in the first instance judicial writs. If such statutes purport to give the circuit courts injunctive power they are ineffectual, since those courts are otherwise vested with such powers under the constitution, § 6(3) Art. V Constitution of Florida; and if they purport to dictate to such courts when, how or under what conditions injunctions should issue they would constitute an unlawful legislative infringement on a judicial function.
On the other hand, we cannot presume that the legislature employed useless language. So if the provision granting jurisdiction to the circuit courts to issue injunctions to enforce this act is to be given any legal effect, it must be said that it is the equivalent of a legislative declaration that a violation of the statutory mandate constitutes an irreparable public injury; and we are aware of no legal barrier to such a legislative proclamation concerning the subject matter of the act before us. The effect of such a declaration in a subsequent judicial proceeding, then, would be that one of the requisites for a writ of injunction need not be proven, i.e., an irreparable injury; and a mere showing that the statute has been or is clearly about to be violated fully satisfies such requirement.
Here, the evidence clearly indicates that appellee met in closed meetings in violation of Chapter 67-356. Further, such meetings were held under such circumstances as to manifestly indicate that appellee intended, in the future, to hold other closed meetings involving the same matters. As noted earlier, appellee maintains here that such meetings are outside the purview of the act, and appellee intends in the future to meet behind closed doors in the two situations which it claims exempt from the act. We hold, however, that it is without authority to so meet, with the one narrow exception as noted above, i.e., where public consultation with its attorney regarding pending or impending litigation would force him to violate the *477 Canons of Ethics as promulgated by the Supreme Court. Thus, if the threat to so meet is hereafter real and imminent appellee may be enjoined, since there obviously is no adequate remedy at law.
In view of the foregoing the judgment appealed from is reversed and the cause is remanded for proceedings consistent with this opinion.
Reversed.
PIERCE and McNULTY, JJ., concur.
NOTES
[1] "Section 1. All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or any political subdivision, except as otherwise provided in the constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, regulation or formal action shall be considered binding except as taken or made at such meeting.

The minutes of a meeting of any such board or commission of any such state agency or authority shall be promptly recorded and such records shall be open to public inspection. The circuit courts of this state shall have jurisdiction to issue injunctions to enforce the purposes of this section upon application by any citizens of this state.
Any person who is a member of a board or commission or of any state agency or authority of any county, municipal corporation or any political subdivision who violates the provisions of this act by attending a meeting not held in accordance with the provisions hereof is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than five hundred dollars ($500.00), or by imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment."
[2] E.g., the performance of quasi-judicial functions.
[3] We note in passing that an attorney who represents a public body such as covered under this statute is an officer of the court and a public figure himself, and we will not assume that he will abuse the above exception and allow the discussions in a properly held secret meeting to include any matters not specifically included in this aspect of the attorney-client relationship.